IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

UNITED STATES OF AMERICA,          )
                                    )
                    Plaintiff,      )
                                    )
v.                                  )          Case No. 09-06008-01-CR-SJ-HFS
                                    )
RAMON D. BOYD,                      )
                                    )
                    Defendant.      )

## REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant's Motion to Suppress Evidence (doc #17). For the reasons set forth below, it is recommended that this motion be granted in part and denied in part.

## I.  INTRODUCTION

On August 12, 2009, the Grand Jury returned a one-count indictment against defendant Boyd. The indictment charged that on May 10, 2008, defendant Boyd, an unlawful user of marijuana, knowingly possessed a firearm, a 9mm rifle, which had been transported in interstate commerce.

On May 26, 2010, the Grand Jury returned a three-count superseding indictment against defendant Boyd. Counts One and Three of the superseding indictment charge that on May 10, 2008, and February 23, 2010, respectively, defendant Boyd, an unlawful user of marijuana, knowing possessed firearms which had been transported in interstate commerce. Count Two charges that on May 10, 2008, defendant, in connection with the acquisition of a firearm, made a false written statement and representation.

On June 15, 2010, an evidentiary hearing was commenced on defendant's motion to suppress. Defendant Boyd was represented by retained counsel Paul M. Tancredi. The Government was represented by Assistant United States Attorney Christina Y. Tabor. The Government called Officer Brian McClintick of the St. Joseph, Missouri Police Department as a witness. Following Officer Brian McClintick's testimony, the hearing was continued to June 18, 2010.

On June 18, 2010, defendant Boyd was again represented by Mr. Tancredi and the Government was again represented by Ms. Tabor. The Government called Detective Steve McClintick of the St. Joseph, Missouri Police Department, Officer Rob Barker and Detective Christopher Rapp of the Independence, Missouri Police Department and Special Agent Tony Donaldson of the Bureau of Alcohol, Tobacco and Firearms as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On May 9 and 10, 2008, from 10:00 p.m. to 2:00 a.m., Officer Brian McClintick and Detective Steve McClintick were working secondary jobs patrolling the Pleasant Heights Apartments for the St. Joseph Housing Authority. (Tr. I[1] at 3-4, 7) The St. Joseph Housing Authority hires officers to patrol the complex due to a high crime rate. (Tr. I at 4) While patrolling, Officer McClintick was in uniform and Detective McClintick was wearing plain clothes. (Tr. I at 8) Both officers were armed. (Tr. I at 8) Shortly after midnight, Officer McClintick observed an Oldsmobile Cutlass with very dark window tint drive into the complex. (Tr. I at 12-13) Officer McClintick testified that there is a local ordinance and a state statute against having window tint darker than 35 percent. (Tr. at 14) The vehicle parked in front of Building 3110. (Tr. I at 13) The vehicle did not have a Pleasant Heights resident sticker on the back window. (Tr. I at 15)

2. Officer McClintick observed two subjects get out of the vehicle, knock on the door to Apartment 7 and then enter the apartment. (Tr. I at 15) After a few seconds, the two subjects went back to their vehicle and got into the trunk and then got back into the vehicle as if to leave. (Tr. I at 15-17) After a short period of time, the two subjects got back out of the vehicle and the person exiting the driver's side was now carrying a red and black duffel bag. (Tr. I at 17) Officer McClintick testified that the entire time the two subjects were getting into the trunk, getting into the vehicle and then getting back out of the vehicle, they were looking around as if they were nervous that they were being watched. (Tr. I at 17) The two subjects walked back into Apartment 7. (Tr. I at 17) The driver carrying the red and black duffel bag was later identified as Ramon Boyd. (Tr. I at 18) The passenger was later identified as Eddie Roberts. (Tr. I at 18)

3. After the two subjects had reentered Apartment 7, the officers approached the vehicle. (Tr. I at 18) The window tint was so dark that the officers could not see inside the vehicle with the flashlights. (Tr. I at 19) This confirmed to the officers that the window tint was not legal because an officer should be able to walk up without any additional lighting and see into a vehicle. (Tr. I at 19) The purpose of

---

[1]"Tr. I" refers to the transcript of the hearing held on June 15, 2010.

the law is for officer safety. (Tr. I at 19) The officers had to shine their lights through the windshield to see inside. (Tr. I at 19)

4.     Between half an hour and an hour after the two subjects reentered Apartment 7, the officers, who were then patrolling in a car, saw the Oldsmobile Cutlass driving away from Building 3110. (Tr. I at 22) The officers decided to stop the vehicle for the window tint violation. (Tr. I at 22) Officer McClintick testified that the officers also suspected that the subjects might have been up to something. (Tr. I at 67) It was approximately 1:00 a.m. (Tr. I at 37, 76-77) The officers activated their lights to pull over the vehicle, but the vehicle did not immediately stop. (Tr. I at 83) The vehicle kept rolling slowly down the street. (Tr. I at 83) As the vehicle was rolling to a stop, the officers could tell there was movement inside the vehicle, but due to the dark windows, they could not tell exactly what the subjects were doing. (Tr. I at 23) The officers turned their spotlight on and still had difficulty seeing into the vehicle. (Tr. I at 23) However, Officer McClintick testified that the driver's window was down and through the side mirror he could make out the body shape of the driver leaning over to his right and down towards the floor as if he were reaching for something or hiding something. (Tr. I at 23, 82, 85) Officer McClintick testified that at this point, the stop escalated from a simple window tint violation to the officers having a reasonable suspicion that the driver has something that he might use to hurt the officers or that he want to hide. (Tr. I at 84) Ramon Boyd was identified as the driver of the vehicle. (Tr. I at 24)

5.     Officer McClintick advised defendant Boyd why he had been stopped and then asked him if he lived in the apartment complex or what his business was at the complex. (Tr. I at 26) Boyd answered the officer's questions. (Tr. I at 26) Officer McClintick testified that Boyd appeared to have a problem keeping his eyes wide open, they were very droopy, and there was a redness of the eyes and around the eyes. (Tr. I at 26) Based on his training and experience, Officer McClintick testified that a droopy eye appearance and redness around the eyes is a common sign of alcohol or drug impairment. (Tr. I at 26) Officer McClintick further testified that everything about Boyd appeared to be slow which is a sign of marijuana usage. (Tr. I at 28) Marijuana usage slows down one's speech, reaction times and movements. (Tr. I at 28) Officer McClintick testified that he did not feel that Boyd's level of impairment was to the point where he could not safely operate the vehicle. (Tr. I at 86)

6.     The officers checked to see if the occupants of the vehicle, defendant Boyd, Eddie Roberts and Chantrice Trent (the tenant of Apartment 7), had any active warrants. (Tr. I at 28-29, 36) No active warrants were found. (Tr. I at 28-29)

7.     Officer McClintick asked defendant Boyd if he had anything illegal in the car such as drugs or weapons. (Tr. I at 29) Boyd laughed and said, "No." (Tr. I at 29) Officer McClintick asked Boyd if he would have a problem with the officers searching his car to verify that he did not have drugs or weapons or anything illegal. (Tr. I at 29) Boyd said he did not have a problem with it. (Tr. I at 29) Officer McClintick understood this to mean he had Boyd's verbal consent to search the vehicle. (Tr. I at 29) Officer McClintick testified that while he believed Boyd to be under the influence of either drugs or alcohol, he did not believe Boyd to be impaired to the extent that he could not give consent. (Tr. I at 94) Officer McClintick based his belief that Boyd was capable of giving consent on Boyd's body language and through talking to him. (Tr. I at 94) Boyd appeared to understand Officer McClintick's questions and responded appropriately. (Tr. I at 94-95) Boyd was not

3

in handcuffs nor detained when the request to search was made.  (Tr. II[2] at 61-62)

8.     Boyd began to reach for the door handle to get out and then he paused, looked towards the center portion of the front of the car and began to mumble something. (Tr. I at 30)  Officer McClintick could not make out what Boyd was saying, but it was something pertaining to, I need to tell you something or that I have something, but Boyd was looking down towards the floorboard while he was talking. (Tr. I at 30)  Officer McClintick asked Boyd to repeat what he said. (Tr. I at 30)  Boyd was still mumbling and Officer McClintick could not make out what he was saying. (Tr. I at 30)  Boyd then made a movement with his hand to reach underneath the driver's seat. (Tr. I at 30)  Officer McClintick told Boyd to step out of the vehicle. (Tr. I at 30-31)  Officer McClintick asked Boyd if he had any weapons or anything on his person and Boyd said no. (Tr. I at 31)  Officer McClintick did a pat-down of Boyd's outer clothing. (Tr. I at 31)  Boyd then told Officer McClintick that he had a gun in the car under the driver's seat. (Tr. I at 31)  Officer McClintick asked Boyd why he carried a gun and Boyd replied that he liked guns. (Tr. I at 32)  Boyd also told Officer McClintick that he had purchased a 30-round magazine for the handgun and that it was also in the car. (Tr. I at 32-33)

9.     Detective McClintick patted down Eddie Roberts and Chantrice Trent for weapons. (Tr. I at 31)  The car was searched by Detective McClintick. (Tr. I at 32; Tr. II at 5)  Detective McClintick found a .9 millimeter Ruger underneath the driver's seat. (Tr. I at 32; Tr. II at 6)  The weapon was not loaded. (Tr. II at 8)  Detective McClintick also found magazines and ammunition in the car. (Tr. I at 32)  A magazine loaded with ten rounds of ammunition was found under the driver's seat next to the pistol. (Tr. II at 9-10)  A single .9 millimeter live round was located on the passenger floorboard. (Tr. II at 10)  A thirty-round magazine loaded with twenty-eight rounds of ammunition was found on the floorboard of the front passenger's seat. (Tr. II at 11)  The officers called for a backup unit at 1:10 a.m. (Tr. I at 38, 78)

10.     Defendant Boyd told the officers that he had a receipt for the gun. (Tr. I at 33)  Boyd then produced a pawn receipt (Government's Exhibit 16) out of his wallet. (Tr. I at 33)  There was no serial number on the receipt to show that it went with the gun in Boyd's possession.  (Tr. I at 34-35)

11.     During the course of the car stop, Officer McClintick asked Chantrice Trent if she would consent to a search of her apartment to verify that no other guns, drugs and/or bullets had been left inside her apartment.  (Tr. I at 36-37)  Ms. Trent advised the officers that she would consent to a search and that she was not sure if there was anything illegal left inside or not.  (Tr. I at 37)  When asked if she knew what was in the duffel bag that the males brought into her apartment, Ms. Trent said she did not know what was in the bag.  (Tr. I at 51-52)  At no time did any of the three subjects claim ownership of the duffel bag or the contents of the bag.  (Tr. I at 54)  At 1:09 a.m., Chantrice Trent signed a Consent to Search form which stated:

> I hereby freely and voluntarily give my consent to Officers of the St. Joseph, Missouri Police Department to conduct a search of:
>
> <u>my home at 3110 Apt. #7 S. 36th Apartments</u>

---

[2]"Tr. II" refers to the transcript of the hearing held on June 18, 2010.

and seize <u>Any illegal items, guns, ammo, drugs, drug related items</u>

(Property)

for evidence of <u>Possession of Drugs/Firearms</u>

(Crime Being Investigated)

        I understand that the Officers have no search warrant authorizing this search, and that I have a Constitutional right to refuse permission for them to conduct the search, and any evidence found may be used against me in Court.

(Government's Ex. 18)  Prior to having Ms. Trent sign the Consent to Search form, the officers looked at a residence sheet for the apartment complex and knew that Ms. Trent was the only person on the lease for Apartment 7.  (Tr. I at 55-56)

12.      Apartment 7 was searched at approximately 1:20 a.m.  (Tr. I at 37)  Officer Roy Hoskins, who had arrived at the scene pursuant to the officers' request for backup, assisted Officer McClintick in the search of the apartment.  (Tr. I at 38)  Detective McClintick remained at the scene of the car stop with defendant Boyd and Eddie Roberts.  (Tr. I at 49; Tr. II at 12-13)  Ms. Trent unlocked the door to the apartment and accompanied the officers inside.  (Tr. I at 38-39)  Ms. Trent volunteered that as she was leaving the apartment, she saw one of the male parties drop a bag on the table.  (Tr. I at 39)  Ms. Trent appeared very, very nervous.  (Tr. I at 39)  Officer McClintick testified that as he entered the apartment, he detected the odor of burnt marijuana.  (Tr. I at 40)  Inside the apartment, Officer McClintick testified that he observed the black and red duffel bag that defendant Boyd had carried into the apartment on the floor of the living room.  (Tr. I at 40)  Just beyond that, Officer McClintick observed two bags of marijuana, green plant material, a couple of rolling papers, a burnt cigar (which had the tobacco replaced with marijuana) and a film canister on a plastic tote that had been turned upside-down.  (Tr. I at 40, 48)  Officer McClintick searched the duffel bag without asking who owned the bag.  (Tr. I at 40, 95)  As he was opening the bag, Ms. Trent said, "Everything in there is what the guys brought."  (Tr. I at 41)  Inside the bag, Officer McClintick found a pair of metal knuckles (a weapon that is illegal to possess) and a digital scale that based on his training and experience, he believed was used for weighing narcotics.  (Tr. I at 41, 49)  Ms. Trent did not object as Officer McClintick was searching the duffel bag.  (Tr. I at 41)  Also seized from Ms. Trent's apartment were two pair of hemostat scissor-style instruments with burn marks on the very tip, which is consistent with holding a marijuana cigarette while smoking it.  (Tr. I at 42-43, 47)

13.      Defendant Boyd and Eddie Roberts were further searched.  (Tr. II at 17)  Roberts had a non-driver license in his wallet for a Michael Jones and $338.00 in cash on his person.  (Tr. II at 14, 15-16)  A black nylon holster for inside the pant was recovered from inside Boyd's pants.  (Tr. I at 45)  Based on the weapon in the vehicle, the drugs and paraphernalia recovered from the apartment and the money, Boyd and Roberts were further detained based on the officers' belief that they were possibly illegally selling drugs.  (Tr. II at 17)  The officers also were not sure about Boyd's identity since he had a brother just a year or two different in age from him and he had no identification card to show who he actually was.  (Tr. II at 18)

14.     Defendant Boyd was handcuffed and sitting in the back seat of a police vehicle when he was asked if he wanted to give a statement. (Tr. II at 62) Detective McClintick told Boyd what had been found in the apartment, that the officers were doing an investigation and that they were trying to figure out what was going on. (Tr. II at 63) Detective McClintick asked Boyd if he was willing to discuss the items that had been found in the apartment. (Tr. II at 63) Detective McClintick testified that he told Boyd that he did not have to talk to him. (Tr. II at 63) After Boyd told Detective McClintick that he did not have a problem speaking to him, Boyd was taken out of the police vehicle and the handcuffs were removed. (Tr. II at 63) At 2:03 a.m., Detective McClintick read Boyd his <u>Miranda</u> rights. (Tr. II at 18) Boyd signed a Waiver of Rights form at 2:06 a.m. (Tr. II at 19; Government's Ex. 22) The form stated:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can and will be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

### WAIVER OF RIGHTS

> I have read this statement of my rights and I understand what my rights are. Keeping these rights in mind, I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. I am ___*21*___ years of age. I attended school through the ___*12ᵗʰ*___.
>     (grade level)
>
> I am employed by _____*Big Mommas Homemade rolls*_____.
>                            (name and address)
>
> I understand the English language.

(Government's Ex. 22) Detective McClintick testified that Boyd appeared to be lucid and did not show any confusion in understanding his rights. (Tr. II at 20) Detective McClintick testified that he did not threaten Boyd or use any force or physical violence to cause Boyd to sign the waiver. (Tr. II at 23) Detective McClintick believed that Boyd signed the waiver voluntarily and with knowledge of the rights that he was waiving. (Tr. II at 23) Boyd gave a statement which was written out by Detective McClintick. (Tr. II at 24; Government's Ex. 23) Boyd signed the statement at 2:26 a.m. (Tr. II at 24; Government's Ex. 23) In his

statement, Boyd admitted, "I had smoked some weed (marijuana) in KC before I came up here. I had about a fourth of a blunt." (Government's Ex. 23) Boyd denied ownership of the scales and marijuana recovered from the apartment. (Government's Ex. 23)

15.     Following a gaze nystagmus test, it was determined that defendant Boyd was okay to operate a vehicle. (Tr. I at 96) Detective McClintick testified that he did not believe Boyd to be so intoxicated with marijuana that he could not have responsibly driven the vehicle. (Tr. II at 59) Boyd was released between 3:00 a.m. and 3:20 a.m. and allowed to drive off. (Tr. I at 96; Tr. II at 29) No tickets had been issued to Boyd. (Tr. I at 100) Since a tint meter was not available, no ticket was written for the tint violation. (Tr. I at 100) The weapon, the drugs and the drug paraphernalia were kept by the officers. (Tr. I at 100) Detective McClintick believed that the thirty-round magazine was illegal. (Tr. I at 100) The weapon was seized as evidence for a potential carry conceal charge against Boyd. (Tr. I at 101) Detective McClintick testified that the following evidence suggested that Boyd had a loaded concealed weapon on his person: the holster recovered from the inside of Boyd's pants; the different magazines; and the single round that was found within the vehicle which would indicate that the gun had been loaded and had the round ejected out of it. (Tr. II at 48-49) Further, Ms. Trent gave Detective McClintick a written statement that Boyd had the weapon concealed under his clothing while on the complex and while operating the vehicle and actually drew the weapon out from underneath his clothing while the officers were stopping him and began to unload it. (Tr. I at 101; Tr. II at 31) Ms. Trent further stated that the marijuana found in her apartment was not hers and that she had observed either Boyd or Roberts, she was not sure which one, drop a baggie of something on the makeshift table in her living room as they were leaving the apartment. (Tr. II at 31)

16.     Defendant Boyd called Detective McClintick on the telephone on a couple of occasions asking for the return of his firearm. (Tr. II at 32) The first time, Detective McClintick told Boyd that the case had been referred to the state prosecutor's office. (Tr. II at 32) The next time, Detective McClintick told Boyd that the case had been referred to the ATF. (Tr. II at 32) Detective McClintick told Boyd that the firearm was being held as evidence, but that he could contact Special Agent Tony Donaldson at ATF to find out the status of his weapon. (Tr. II at 32-33) Detective McClintick had spoken to Special Agent Donaldson about the evidence that had been recovered in the investigation during the early morning hours of May 10, 2008. (Tr. II at 32-33) Based on the information provided to Special Agent Donaldson by Detective McClintick, Donaldson believed Boyd was a person prohibited from possessing a firearm and Donaldson had advised McClintick that the gun could not legally be returned to Boyd. (Tr. II at 156)

17.     On May 22, 2008, defendant Boyd called Special Agent Donaldson and told him that he wanted his gun back. (Tr. II at 146-47) Special Agent Donaldson asked Boyd if he would be willing to meet with him to discuss what the issues were with the gun. (Tr. II at 147) Boyd was not interested in meeting with Special Agent Donaldson. (Tr. II at 147) Special Agent Donaldson asked Boyd if he had told the officers that he had used marijuana that day. (Tr. II at 148) Boyd told Special Agent Donaldson that he had smoked marijuana that day, but the marijuana that was in the apartment was not his. (Tr. II at 148) Special Agent Donaldson testified that he told Boyd that a person who uses illegal drugs is prohibited by federal law from possessing a firearm. (Tr. II at 148) Special Agent Donaldson further testified that Boyd just kind

of blew that off and said basically if he was not getting his gun back, they were done talking. (Tr. II at 148)

18.    On February 23, 2010, Officer Rob Barker was traveling westbound on U.S. 24 Highway near Lee's Summit Road. (Tr. II at 69-70) Officer Barker observed a Chrysler LHS make an abrupt left turn onto 24 Highway and continue eastbound. (Tr. II at 70) Officer Barker testified that the left turn was so abrupt that he observed what he calls "body roll," that is the cab of the vehicle rolled a bit as it turned. (Tr. II at 70) The vehicle was also traveling faster than the 35 miles per hour speed zone. (Tr. II at 70) Officer Barker turned around and followed the vehicle. (Tr. II at 70) Officer Barker ran the vehicle's license plate through dispatch. (Tr. II at 70) Dispatch advised that the plates were issued to a 1984 Oldsmobile. (Tr. II at 71) The fact that the plates were on a different vehicle was a traffic violation. (Tr. II at 71) Officer Barker decided to conduct a vehicle check to ask the driver if the vehicle was legally registered. (Tr. II at 71)

19.    Officer Barker activated his emergency lights to attempt to stop the Chrysler LHS. (Tr. II at 71-72) The vehicle pulled into a McDonald's parking lot. (Tr. II at 71) The activation of the emergency lights also activated the audio and video recording devices in the police vehicle. (Tr. II at 71-72) The driver of the vehicle was identified as Ramon Boyd. (Tr. II at 72) The passenger was identified as Eddie Roberts. (Tr. II at 73) Boyd said that he owned the vehicle; however, the vehicle was not registered to him. (Tr. II at 73) Officer Barker ran a computer check to determine whether Boyd had any warrants. (Tr. II at 73) Dispatch advised that Boyd had a felony weapons warrant through ATF headquarters out of Washington. (Tr. II at 73) Boyd also had a Kansas City traffic warrant. (Tr. II at 73) Officer Barker advised Boyd of the warrants and placed him under arrest on the warrants. (Tr. II at 74) Boyd was searched incident to his arrest. (Tr. II at 75)

20.    Defendant Boyd repeatedly told Officer Barker that he had taken care of his warrants. (Tr. II at 74) Officer Barker told Boyd that he would re-run his social security number through the computer and double-check to make sure it was not someone else. (Tr. II at 75) Officer Barker ran another computer check with the same results. (Tr. II at 75)

21.    Defendant Boyd was placed in a transport wagon. (Tr. II at 75) Officer Barker asked Boyd if there was anything illegal in his vehicle and Boyd responded that there was not. (Tr. II at 75) Officer Barker asked Boyd if it would be okay for him to search the vehicle. (Tr. II at 75) Boyd asked Officer Barker what he would be searching for and Officer Barker said he would be searching for weapons. (Tr. II at 76) Boyd initially told Officer Barker that he did not mind, do what you have to do. (Tr. II at 76) Boyd then told Officer Barker that he was not going to be the one driving the vehicle, so he should ask Eddie Roberts if it was okay with him for Officer Barker to search the vehicle. (Tr. II at 77-78) Officer Barker responded to Boyd that it was Boyd's vehicle, so he did not need Roberts' consent to search the vehicle. (Tr. II at 78) Nevertheless, Officer Barker walked over to Roberts and asked him if there was anything illegal in the vehicle. (Tr. II at 84) Roberts said he did not know, it was his brother's car. (Tr. II at 84) Officer Barker asked Roberts if he had any objection to Barker searching the vehicle. (Tr. II at 84) Roberts did not express any objection. (Tr. II at 84)

22.    Officer Barker searched the vehicle. (Tr. II at 83-84) Officer Barker found a black

holster which contained a gun on the driver's floorboard. (Tr. II at 85)  The gun, a Ruger P94, had a fully loaded ten-round magazine inside it and one Hornady hollow point round in the chamber.  (Tr. II at 85)  In the center console of the vehicle, Officer Barker found another fully loaded ten-round magazine. (Tr. II at 86)  Under the passenger seat, Officer Barker found a plastic baggie which contained a green leafy substance which field-tested positive for marijuana.  (Tr. II at 86)

23.    Officer Barker testified that when he arrests someone on a warrant, he makes it a practice to always tell the person the offense with which they are charged.  (Tr. II at 89)  Officer Barker told defendant Boyd what was relayed to him through dispatch, i.e. that Boyd had a felony weapons charge.  (Tr. II at 90-91, 100)

24.    The only charges Officer Barker wrote against defendant Boyd were for improper registration and that Boyd had a working radar detector in the vehicle. (Tr. II at 126)

25.    Defendant Boyd was taken to the Independence Police Department Detention and placed on a 24-hour hold with an arrest time of 4:15 p.m.  (Tr. II at 127)  Boyd was placed on a 24-hour hold because a weapon was found in the vehicle.  (Tr. II at 127)

26.    Officer Barker contacted Detective Christopher Rapp on February 23, 2010, and informed him that Ramon Boyd was in custody.  (Tr. II at 128)  Detective Rapp contacted Boyd in the Detention Unit of the Independence, Missouri Police Department the following day at approximately 9:40 a.m. (Tr. II at 129)  Detective Rapp identified himself as a detective with the Independence Police Department and asked Boyd if he would speak with him.  (Tr. II at 129)  Boyd agreed to speak with Detective Rapp.  (Tr. II at 129)  Detective Rapp escorted Boyd to an interview room in the Investigations Unit.  (Tr. II at 129)  ATF Special Agent Tony Donaldson was also present in the interview room.  (Tr. II at 129)

27.    Prior to beginning the interview, Detective Rapp informed defendant Boyd of his Miranda rights.  (Tr. II at 130)  Boyd signed a Waiver of Rights form at 9:40 a.m. (Government's Ex. 40; Tr. II at 132)  The form stated:

## Warning of Rights

You must understand your rights before we ask you any questions.

You have the right to remain silent.

Anything you say can be used against you in a court of law or other proceedings.

You have the right to talk to a lawyer before we question you and to have him or her with you during the questioning.

If you cannot afford a lawyer and want one, a lawyer will be appointed for you.  If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time until you talk to a lawyer.

I have read this statement of my rights and it has been read to me.  I

understand what my rights are.

**Waiver of Rights**
Having been informed of your rights, do you wish to talk to me now?

(Government's Ex. 40) Boyd placed a checkmark in the "Yes" box next to the last question. (Government's Ex. 40; Tr. II at 132) Detective Rapp testified that Boyd did not appear to have any difficulty understanding his rights. (Tr. II at 132)

28. Prior to any questioning, defendant Boyd expressed confusion as to why he had been arrested. (Government's Ex. 38) Detective Rapp told Boyd that he had brought Boyd to the interview room to talk about that. (Id.) Detective Rapp then asked Boyd about the events of the Independence arrest. (Tr. II at 135-36) Detective Rapp verified that the vehicle was Boyd's. (Tr. II at 136) Detective Rapp asked Boyd if the Ruger found in the vehicle was his and Boyd stated yes. (Tr. II at 136) Detective Rapp asked Boyd about the marijuana found underneath the front passenger's seat and Boyd stated that he would take the blame for it. (Tr. II at 136) Detective Rapp asked Boyd if he smoked marijuana and Boyd stated that he did. (Tr. II at 136) When asked if he was addicted to weed, Boyd replied that he liked the feeling, but he would not say that he was addicted. (Tr. II at 136-37) Detective Rapp spoke to Boyd for five to ten minutes before turning the questioning over to Special Agent Donaldson. (Tr. II at 137) Detective Rapp spoke to Boyd about the investigation of the state charges, i.e. the weapon and the narcotics found in the vehicle. (Tr. II at 138-39) Special Agent Donaldson later talked to Boyd about the federal warrant. (Tr. II at 139) Detective Rapp did not tell Boyd that he was facing a charge of being an unlawful drug user in possession of a firearm. (Tr. II at 141) Detective Rapp testified that he intentionally asked Boyd about the marijuana and the gun before telling him that he was already charged in federal court with being an unlawful drug user in possession of a firearm. (Tr. II at 142)

29. Special Agent Donaldson was present for the interview so that he could question defendant Boyd about what had happened in St. Joseph. (Tr. II at 149) Special Agent Donaldson was then going to transport Boyd downtown to the federal courthouse. (Tr. II at 149)

30. Special Agent Donaldson explained to defendant Boyd the nature of the charges that he faced federally. (Tr. II at 149) Special Agent Donaldson told Boyd that he had been charged federally with being a drug user in possession of a firearm. (Tr. II at 150) Special Agent Donaldson testified that he was not aware of the requirement of Federal Rule of Criminal Procedure 4 that an arrested person be informed of the offense charged if the arresting officer does not have the warrant. (Tr. II at 151)

31. The arrest warrant contained a mistake in that it stated it was for having been convicted of a crime punishable by imprisonment for a term exceeding one year, instead of the actual charge, unlawful marijuana user. (Tr. II at 152)

## III. DISCUSSION

Defendant Boyd seeks to suppress evidence that was obtained in contravention of his constitutional rights. Defendant organized his arguments by the following four events where

evidence was gathered: (1) May 10, 2008, 36th & Pickett, St. Joseph, Missouri; (2) May 22, 2008, ATF Field Office, Kansas City, Missouri; (3) February 23, 2010, US 24 Highway & M 291 Highway, Independence, Missouri; and (4) February 24, 2010, Independence Police Department, Independence, Missouri. The Court will address the issues raised regarding the evidence gathered at each of these events.

A.    May 10, 2008, St. Joseph, Missouri

Defendant Boyd raises several issues with respect to the car stop in St. Joseph and the subsequent searches of Boyd's car, Ms. Trent's apartment and Boyd's duffel bag. First, with respect to the car stop, defendant Boyd questions whether the officers had a legitimate basis for the traffic stop and even if there was a basis for the stop, Boyd argues that the stop was impermissibly extended. Next, Boyd questions whether the officers obtained a valid consent to search the vehicle. With respect to the duffel bag, defendant Boyd argues that he had a reasonable expectation of privacy in his bag and Ms. Trent's consent to search the apartment was not valid as to Boyd's bag. With respect to the statement given by defendant Boyd, Boyd argues that the Miranda waiver was invalid, but even if it was valid, portions of the statement should be redacted as it covered evidence that should otherwise be suppressed. Finally, defendant Boyd argues that the officers had no valid basis for seizing his legally purchased firearm.

1.    Car Stop

The initial stop of defendant Boyd's vehicle was lawful. As the Eighth Circuit Court of Appeals has observed, "any traffic violation, however minor, given an officer probable cause to stop a vehicle." United States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009). Accord United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007); United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002), cert. denied, 538 U.S. 992 (2003). Prior to pulling the vehicle over, the officers observed that its windows were extremely darkly tinted. (See Fact Nos. 1 and 3, supra) Officer McClintick

testified that it is a traffic violation to have windows tinted that darkly.[3]  (See Fact No. 1, supra) This traffic violation provided probable cause to stop the vehicle.[4]  The fact that the officers might also have suspected that the subjects inside the vehicle were up to something does not invalidate the traffic stop.  In United States v. Cummins, 920 F.2d 498 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991), the Eighth Circuit Court of Appeals found:

> In our view, this otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity.  It is also our view that the stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions.

Id. at 501.  See also United States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009)("irrelevant that the officer may have ignored the violation were it not for a suspicion that greater crimes are afoot"); United States v. Herrera-Gonzalez, 474 F.3d 1105, 1109 (8th Cir. 2007)("the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop").

Under Terry v. Ohio, 392 U.S. 1, 20 (1968), given the lawfulness of the initial stop, the question is whether the resulting detention was "reasonably related in scope to the circumstances which justified the interference in the first place."  Here, following defendant Boyd's stop for a

---

[3]The state law with respect to vision-reducing material applied to windows provides:

1.  Any person may operate a motor vehicle with front sidewing vents or windows located immediately to the left and right of the driver that have a sun screening device, in conjunction with safety glazing material, that has a light transmission of thirty-five percent or more plus or minus three percent and a luminous reflectance of thirty-five percent or less plus or minus three percent. ...

Mo. Rev. Stat. § 307.173.

[4]"Even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an 'objectively reasonable one.' ... United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005)(noting that '[t]he determinative question is not whether [the defendant] actually violated the Motor Vehicle Code ... but whether an objectively reasonable police officer could have formed a reasonable suspicion that [the defendant] was committing a code violation')."  United States v. Herrera-Gonzalez, 474 F.3d 1105, 1109 (8th Cir. 2007).  The Court has no reason to doubt that Officer McClintick was correct in his assessment that defendant Boyd's windows were darker than permitted by law.  However, even if Officer McClintick was mistaken, given the evidence before the Court that the officers could not see inside the vehicle when the windows were up, the Court finds Officer McClintick's mistake to be an objectively reasonable one.

traffic violation, the officers could tell there was movement inside the vehicle. (See Fact No. 4, supra) Officer McClintick testified that he saw the driver leaning over to his right and down towards the floor as if he was reaching for something or hiding something. (Id.) While Officer McClintick was advising defendant Boyd of the reason for the stop and asking what his business was at the apartment complex,[5] he noticed that Boyd appeared to have a problem keeping his eyes wide open, they were very droopy and there was a redness of the eyes and around the eyes. (See Fact No. 5, supra) Officer McClintick testified that based on his training and experience, he associated the droopy eye appearance and redness around the eyes as a sign of either alcohol or drug impairment. (Id.) Officer McClintick testified that everything about Boyd appeared to be slow which is also a sign of marijuana usage. (Id.) Officer McClintick checked to see if Boyd had any active warrants. (See Fact No. 6, supra) Given defendant Boyd's suspicious movement inside the vehicle and his impaired appearance, the officers had justification for a greater intrusion unrelated to the traffic offense. See United States v. Gregory, 302 F.3d 805, 810 (8th Cir. 2002)(if circumstances give rise to suspicions unrelated to traffic offense, not unreasonable for officer to extend detention long enough to check criminal history). Defendant Boyd's behavior led the officers "'reasonably to conclude in light of [their] experience that criminal activity may [have been] afoot.'" United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990)(quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). The totality of the circumstances known to the officers met the requisite level of reasonable suspicion under Terry and entitled them to detain defendant Boyd until they had satisfied their suspicions. See Cummins, 920 F.2d at 502.

As Boyd was reaching for the door handle to get out of his vehicle so that it could be searched, he paused, looked down towards the floorboard and mumbled something that Officer McClintick could not understand. (See Fact No. 8, supra) Officer McClintick asked Boyd to repeat

---

[5]"The Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration ... [and] inquire into the driver's destination and purpose for the trip ..." United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002), cert. denied, 538 U.S. 992 (2003).

what he said, but could still not make out what Boyd was saying. (Id.) Boyd made a movement with his hand to reach underneath the driver's seat. (Id.) Officer McClintick then told Boyd to step out of the vehicle and did a pat-down of Boyd's outer clothing. (Id.) Boyd told Officer McClintick that he had a gun in the car under the driver's seat. (Id.) "The officers may take such additional steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" United States v. Doffin, 791 F.2d 118, 120 (8th Cir.), cert. denied, 479 U.S. 861 (1986)(quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). A police officer may conduct a pat-down search of the suspect during an investigative stop if the officer has reason to believe that such person might be armed and dangerous. See Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Woodall, 938 F.2d 834, 837 (8th Cir. 1991). Given that defendant Boyd was reaching underneath the driver's seat while mumbling something, Officer McClintick had a credible concern for officer safety. Officer McClintick's action in then bringing defendant Boyd out of the vehicle and patting him down for weapons was reasonably necessary to protect the officers' personal safety and to maintain the status quo so that the officers could determine whether Boyd was engaged in criminal activity.

Defendant Boyd claims that his detention lasted longer than necessary to effectuate the purpose of the stop. However, the evidence before the Court is that Officer McClintick asked defendant for consent to search the vehicle soon after he was stopped.[6] The search revealed a weapon and ammunition which necessitated further investigation. The Court finds that the officers acted diligently to obtain information and investigate the suspicions which that information aroused. See United States v. Foley, 206 F.3d 802, 806 (8th Cir. 2000). No constitutional violation took place in the initial vehicle stop.

### 2. Consent to Search Vehicle

A search that is conducted pursuant to a valid consent does not violate the Constitution. See

---

[6]At approximately 1:00 a.m., the officers stopped the vehicle. (See Fact No. 4, supra) By 1:10 a.m., the stop, consent to search, search, recovery of the firearm and ammunition and the call for a backup unit had already occurred. (See Fact Nos. 4, 7 and 9, supra)

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Ramey, 711 F.2d 104, 107 (8th Cir. 1983); United States v. Matthews, 603 F.2d 48, 51 (8th Cir. 1979), cert. denied, 444 U.S. 1019 (1980).  The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion.  See United States v. Palacios-Suarez, 149 F.3d 770, 772 (8th Cir. 1998); United States v. Turpin, 707 F.2d 332, 334 (8th Cir. 1983).  In United States v. Sanchez, 156 F.3d 875 (8th Cir. 1998), the Eighth Circuit Court of Appeals set forth the following with respect to the relevant circumstances:

> Whether consent is voluntary depends upon the "totality of the circumstances." When evaluating such circumstances, we pay particular attention to the characteristics of the person giving consent and to the encounter from which the consent arose.  Relevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation.  To assess the environment surrounding the consent, we consider the length of time that the suspect was detained and questioned; whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search.

Id. at 878 (citations omitted).

Officer McClintick testified that defendant Boyd gave him verbal consent to search the vehicle.  (See Fact No. 7, supra)  Very little time elapsed between the officers stopping Boyd and Boyd giving consent to search to Officer McClintick.[7]  Boyd was not in custody nor was he handcuffed when he consented to the search.  (See Fact No. 7, supra)  The encounter did not occur in a secluded place.  No evidence was presented to suggest that the officers physically threatened or intimidated Boyd in order to obtain his consent.  While Officer McClintick testified that he believed Boyd was under the influence of either drugs or alcohol, he did not believe Boyd to be impaired to the extent that Boyd could not give consent.  (See Fact No. 7, supra)  Officer McClintick testified that he based his belief that Boyd was capable of giving consent on Boyd's body language

---

[7]As set forth above, at approximately 1:00 a.m., the officers stopped the vehicle.  (See Fact No. 4, supra)  By 1:10 a.m., the stop, consent to search, search, recovery of the firearm and ammunition and the call for a backup unit had already occurred.  (See Fact Nos. 4, 7 and 9, supra)

and through talking to him.  (Id.)  Boyd appeared to understand Officer McClintick's questions and respond appropriately.  (Id.)  Boyd, who was 21 years old, had attended school through the twelfth grade.  (See Fact No. 14, supra)  Finally, Boyd did not object to the search, but rather told Officer McClintick that he had a gun and a 30-round magazine in the vehicle.  (See Fact No. 8, supra)  The Government met its burden in establishing that defendant Boyd's consent to search was freely and voluntarily given and not the result of duress or coercion.

       3.       Search of Duffel Bag

Chantrice Trent signed a Consent to Search form to permit officers to search her apartment at 1:09 a.m.  (See Fact No. 11, supra)  The apartment was searched at approximately 1:20 a.m.  (See Fact No. 12, supra)  Inside the apartment, Officer McClintick testified that he detected the odor of burnt marijuana.  (Id.)  Officer McClintick testified that he observed the black and red duffel bag that defendant Boyd had carried into the apartment on the floor of the living room.  (Id.)  Just beyond that, Officer McClintick observed two bags of marijuana, green plant material, a couple of rolling papers, a burnt cigar (which had the tobacco replaced with marijuana) and a film canister on a plastic tote that had been turned upside-down.  (Id.)  Ms. Trent volunteered that as she was leaving the apartment, she saw one of the male parties drop a bag on the table.  (Id.)  Officer McClintick searched the duffel bag without asking who owned the bag.  (See Fact No. 12, supra)  Inside the duffel bag, Officer McClintick found a digital scale that based on his training and experience, he believed was used for weighing narcotics.  (Id.)

Defendant Boyd argues that he had a reasonable expectation of privacy in his duffel bag and Ms. Trent's consent to search the apartment was not valid as to the bag.  The government contends that Ms. Trent had apparent authority to consent to a search of the bag and that the officers acted in good faith and in reasonable reliance on Trent's voluntary consent.

"It is well established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement, United States v. Karo, 468 U.S. 705, 717 (1984), and that consent is 'one of the specifically established exceptions to the requirements of both

a warrant and probable cause.' Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)." United States v. Jaras, 86 F.3d 383, 388 (5th Cir 1996). For a search to be valid pursuant to a third party's consent, the government must demonstrate that the third party had actual or apparent authority to consent to the search. Jaras, 86 F.3d at 384 (citing Illinois v. Rodriguez, 497 U.S. 177, 186-87 (1990)). The government has the burden of establishing the effectiveness of the third party's consent. See United States v. Davis, 332 F.3d 1163, 1169 (9th Cir. 2003). Here, the government does not argue actual authority, so the Court will only examine Ms. Trent's apparent authority to consent to the search of defendant's duffel bag. "[E]ven where third-party consent comes from an individual without actual authority over the property searched, there is no Fourth Amendment violation if the police conducted the search in good faith reliance on the third-party's *apparent authority* to authorize the search through her consent." United States v. Purcell, 526 F.3d 953, 963 (6th Cir. 2008).

In United States v. Waller, 426 F.3d 838 (6th Cir. 2005), the Sixth Circuit Court of Appeals provided the following discussion with respect to a third party's apparent authority to consent to the search of the defendant's suitcase which was located in the third party's apartment:

> ... "When one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consent party had authority over the premises.'" United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996)(quoting Rodriguez, 497 U.S. at 188). Whether the facts presented at the time of the search would "warrant a man of reasonable caution" to believe the third party has common authority over the property depends upon all of the surrounding circumstances. Rodriguez, 497 U.S. at 188 (citation omitted). The government cannot establish that its agents reasonably relied upon a third party's apparent authority "if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful without further inquiry.'" United States v. McCoy, ... 1999 WL 357749, at *10 (6th Cir. May 12, 1999) ....
>
> * * *
>
> ... The officers' failure to make further inquiry is especially pronounced in this case because Howard [the third party] was in the next room when the police found the luggage, and Waller [the defendant] was being detained outside the apartment. It would not have been burdensome for the officers to have asked Howard whether the luggage belonged to him ... prior to opening the bag. ...

> ... Deliberate ignorance of conclusive ownership of the suitcase does not excuse the warrantless search of the suitcase, especially when actual ownership could easily have been confirmed. We agree with the Tenth Circuit that "to hold that an officer may reasonable find authority to consent solely on the basis of the presence of a suitcase in the home of another would render meaningless the Fourth Amendment's protection of such suitcases." United States v. Salinas-Cano, 959 F.2d 861, 866 (10th Cir. 1992).

Waller, 426 F.3d at 846, 849.

As set forth in Waller, an officer has a duty to inquire in ambiguous situations. 426 F.3d at 847. Accord United States v. Purcell, 526 F.3d 953, 963 (6th Cir. 2008). The officers in the case before this Court were presented with an ambiguous situation as to whether Ms. Trent had authority to consent to a search of the duffel bag. While the duffel was left in Ms. Trent's apartment, the officers had observed defendant Boyd get the duffel bag out of his vehicle and carry it into the apartment. (See Fact Nos. 2 and 12, supra) As Officer McClintick was opening the bag, Ms. Trent said, "Everything in there is what the guys brought." (See Fact No. 12, supra) Officer McClintick searched the bag without asking who owned the bag. (Id.) As in Waller, Officer McClintick's failure to make further inquiry is especially pronounced because Ms. Trent was present in the apartment and defendant Boyd was right outside the apartment. It would not have been burdensome for Officer McClintick to have asked Ms. Trent or defendant Boyd who owned the bag prior to searching it. Deliberate ignorance of conclusive ownership of the duffel bag does not excuse the warrantless search of the bag. Officer McClintick's warrantless entry into defendant Boyd's duffel bag without further inquiry was unlawful under the Fourth Amendment. The items discovered within the bag (that is the pair of metal knuckles and digital scale) must be suppressed.

4.    Statement

Defendant Boyd argues that the Miranda waiver was invalid, but even if it was valid, portions of the statement should be redacted as it covered evidence that should otherwise be suppressed.

In United States v. Jones, 23 F.3d 1307 (8th Cir. 1994), the Eighth Circuit Court of Appeals set forth the following discussion about the validity of a Miranda rights waiver:

"The inquiry [into the validity of a waiver] has two distinct dimensions. ... First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

Id. at 1313 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

The evidence presented at the hearing does not support defendant's argument that his statement was involuntary. The evidence before the Court shows that defendant Boyd was 21 years old and had a 12th grade education level. (See Fact No. 14, supra) The evidence shows that Detective McClintick asked Boyd if he was willing to discuss the items that had been found in Ms. Trent's apartment, but told Boyd that he did not have to talk to him. (Id.) While Boyd was handcuffed when asked if he wanted to give a statement, the handcuffs were removed prior to Boyd making the statement. (Id.) Detective McClintick read defendant Boyd his Miranda rights and Boyd signed a Waiver of Rights form before being questioned. (Id.) Detective McClintick testified that Boyd appeared to be lucid and did not show any confusion in understanding his rights. (Id.) Detective McClintick testified that he did not threaten Boyd or use any force or physical violence to cause Boyd to sign the waiver. (Id.) Detective McClintick testified that he believed that Boyd signed the waiver voluntarily and with knowledge of the rights that he was waiving. (Id.)

The Court finds that defendant Boyd was fully advised of his rights, that he understood his rights and that he voluntarily and intentionally waived those rights and agreed to talk to Detective McClintick.

Defendant next argues that even if the Miranda waiver was valid, portions of his statement should be redacted as it covered evidence that should otherwise be suppressed. This "fruit of the poisonous tree" argument is persuasive. As set forth above, Officer McClintick's search of defendant Boyd's duffel bag was unlawful under the Fourth Amendment. Detective McClintick asked Boyd to discuss the items found in the apartment. In his statement, defendant Boyd discusses the scale found in the bag. Given that the scale would not have been discussed but for Officer

McClintick's discovery of it in the duffel bag, that portion of the statement in which Boyd discusses the scale must be redacted as fruit of the poisonous tree.  See Wong Sun v. United States, 371 U.S. 471 (1963).  The remainder of the statement was not linked to items discovered in the duffel bag and, thus, may be used as evidence against defendant.

     5.    Seizure of Firearm

While defendant Boyd argues that the officers had no valid basis for seizing his legally purchased firearm, Officer McClintick testified at the hearing that the weapon was seized as evidence for a potential carry conceal charge against Boyd.  (See Fact No. 15, supra)  Detective McClintick testified that the following evidence suggested that Boyd had a loaded concealed weapon on his person:  the holster recovered from the inside of Boyd's pants; the different magazines; and the single round that was found within the vehicle which would indicate that the gun had been loaded and had the round ejected out of it.  (Id.)  Further, Ms. Trent gave Detective McClintick a written statement that Boyd had the weapon concealed under his clothing while on the complex and while operating the vehicle and actually drew the weapon out from underneath his clothing while the officers were stopping him and began to unload it.  (Id.)  This is consistent with Officer McClintick's observation of the driver leaning over to his right and down towards the floor as if he were hiding something.  (See Fact No. 4, supra)  Contrary to defendant's argument, the Court finds that the officers had a valid basis for seizing the firearm.

    B.    May 22, 2008, ATF Field Office

Defendant Boyd argues that any admissions he made to Special Agent Donaldson should be suppressed due to a violation of Miranda.  Defendant further argues that any admissions should be suppressed because he and Special Agent Donaldson were discussing evidence that should otherwise be suppressed.  Finally, defendant argues that any admissions should be suppressed as he was lured into calling Special Agent Donaldson after Donaldson deprived him of his property without due process of law.

First, "[t]he basic rule of Miranda is that an individual must be advised of the right to be free

from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990). Defendant Boyd did not receive <u>Miranda</u> warnings before talking to Special Agent Donaldson. No warnings were necessary because defendant Boyd was not in custody. In fact, the statements were made during a telephone conversation that Boyd initiated. (<u>See</u> Fact No. 17, <u>supra</u>) There was no violation of <u>Miranda</u>.

Next, defendant Boyd argues that any admissions should be suppressed because he and Special Agent Donaldson were discussing evidence that should otherwise be suppressed. Defendant Boyd and Special Agent Donaldson discussed Boyd's gun that had been seized. (<u>See</u> Fact No. 17, <u>supra</u>) Special Agent Donaldson also asked Boyd if he had told the St. Joseph officers that he had used marijuana the day of the car stop. (<u>Id.</u>) Boyd told Special Agent Donaldson that he had smoked marijuana that day, but the marijuana that was in the apartment was not his. (<u>Id.</u>) As set forth above, there is no basis for suppressing the seized firearm. Defendant Boyd was lawfully stopped for a traffic violation and consented to the search of his vehicle which revealed the firearm. With respect to the discussion of whether Boyd had used marijuana, Boyd admitted in his previous written statement, "I had smoked some weed (marijuana) in KC before I came up here. I had about a fourth of a blunt." (<u>See</u> Fact No. 14, <u>supra</u>) While that portion of the statement in which Boyd discusses the scale must be redacted as fruit of the poisonous tree, the remainder of the statement was not linked to items discovered in the duffel bag and, thus, will not be suppressed. Defendant Boyd's admissions to Special Agent Donaldson will likewise not be suppressed.

Finally, defendant Boyd argues that any admissions should be suppressed as he was lured into calling Special Agent Donaldson after Donaldson deprived him of his property without due process of law. Defendant Boyd called Special Agent Donaldson because he wanted his gun back. (<u>See</u> Fact No. 17, <u>supra</u>) Special Agent Donaldson testified that he told Boyd that a person who uses illegal drugs is prohibited by federal law from possessing a firearm. (<u>Id.</u>) A grand jury returned an indictment charging Boyd with being an unlawful drug user in possession of a firearm. Special

Agent Donaldson committed no constitutional violation in retaining defendant Boyd's firearm.

C.     February 23, 2010, Independence, Missouri

With respect to the car stop in Independence, Missouri, defendant Boyd questions whether Officer Barker obtained a valid consent to search the vehicle given the misreported felon in possession of a firearm charge. Next, defendant questions that even if there originally was consent, whether that consent was revoked. Finally, defendant argues that Officer Barker failed to honor defendant's Rule 4(c)(3)(A) due process right to immediate notification of the offense charged.

As set forth above, a search that is conducted pursuant to a valid consent does not violate the Constitution. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Ramey, 711 F.2d 104, 107 (8th Cir. 1983); United States v. Matthews, 603 F.2d 48, 51 (8th Cir. 1979), cert. denied, 444 U.S. 1019 (1980). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See United States v. Palacios-Suarez, 149 F.3d 770, 772 (8th Cir. 1998); United States v. Turpin, 707 F.2d 332, 334 (8th Cir. 1983). In United States v. Sanchez, 156 F.3d 875 (8th Cir. 1998), the Eighth Circuit Court of Appeals set forth the following with respect to the relevant circumstances:

> Whether consent is voluntary depends upon the "totality of the circumstances." When evaluating such circumstances, we pay particular attention to the characteristics of the person giving consent and to the encounter from which the consent arose. Relevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation. To assess the environment surrounding the consent, we consider the length of time that the suspect was detained and questioned; whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search.

Id. at 878 (citations omitted).

After defendant Boyd was arrested on a "felony weapons warrant" and placed in a transport wagon, Officer Barker testified that he asked Boyd if it would be okay for him to search the vehicle. (See Fact No. 21, supra) Officer Barker testified that Boyd asked him what he would be searching

for and Officer Barker said he would be searching for weapons.[8]  (Id.)  Officer Barker testified that Boyd then gave him verbal consent to search the vehicle.  (Id.)  While Boyd was in custody when he consented to the search, the Eighth Circuit Court of Appeals has stated that "even persons who have been arrested and are in custody can voluntarily consent to a search."  United States v. Miller, 20 F.3d 926, 930 (8th Cir.), cert. denied, 513 U.S. 886 (1994).  No evidence was presented to suggest that Boyd was intoxicated or otherwise impaired when he gave consent.  Boyd, who was then 23 years old,[9] had attended school through the twelfth grade.  (See Fact No. 14, supra)  Boyd had some experience with officers seeking consent to search as he had previously consented to a search of his vehicle in St. Joseph.  The encounter did not occur in a secluded place.  No evidence was presented to suggest that the officer physically threatened or intimidated Boyd in order to obtain his consent.  Rather, Officer Barker obliged Boyd by re-running the computer check when Boyd was adamant that he had no outstanding warrants.  (See Fact No. 21, supra)  The Court finds that the government met its burden in establishing that defendant Boyd's consent to search was freely and voluntarily given and not the result of duress or coercion.

Defendant Boyd next questions that even if there originally was consent, whether that consent was revoked when he advised Officer Barker that he should ask Eddie Roberts if it was okay with him since Roberts would now be driving the vehicle.  Officer Barker correctly informed Boyd that Boyd, as the owner of the vehicle, was the person whose consent was necessary.  See United States v. Barragan, 379 F.3d 524, 529-30 (8th Cir. 2004)(consent of passenger who did not have an

---

[8]Defendant argues that the misreported felon in possession of a firearm charge vitiated the voluntariness of any consent given.  However, defendant knew that Officer Barker was seeking his permission to search for weapons in the vehicle.  Defendant also knew that dispatch records were showing he had a felony weapons warrant.  (See Fact No. 23, supra)  Further, Special Agent Donaldson had previously informed defendant that a person who uses illegal drugs is prohibited by federal law from possessing a firearm.  (See Fact No. 17, supra)  Whether defendant would have denied consent had Officer Barker advised him that he was facing a charge of being an unlawful drug user in possession of a firearm calls for speculation.  Given that there was no evidence of intentional misrepresentation on the part of the police or prosecutor, the Court declines to engage in such speculation.

[9]The superseding indictment lists defendant's date of birth as August 28, 1986.

ownership interest in vehicle is irrelevant). In any event, Eddie Roberts did not express any objection to Officer Barker searching the vehicle. (See Fact No. 21, supra)

Finally, the Court must deny defendant's argument that Officer Barker failed to honor defendant's Rule 4(c)(3)(A)[10] due process right to immediate notification of the offense charged. Officer Barker advised defendant of the existence of the federal warrant and of the charge as it was reported to him by dispatch. There was no wrongdoing on the part of Officer Barker.

> D. February 24, 2010, Independence Police Department

Defendant Boyd argues that the Miranda waiver given on February 24, 2010, was invalid given the misreported felon in possession of a firearm charge. According to defendant, the officers exploited the fact that he was unaware of the actual charges he was facing.

The Court agrees with defendant Boyd that Detective Rapp and Special Agent Donaldson exploited the fact that Boyd was unaware of the actual charges he was facing. In the video, defendant Boyd advises Detective Rapp that he is confused as to why he has been arrested. (See Fact No. 28, supra) Detective Rapp tells Boyd that he brought Boyd to the interview room to talk about that and then proceeds to ask Boyd about the events of the Independence arrest. (Id.) Detective Rapp asked Boyd if the Ruger found in the vehicle was his and Boyd stated yes. (Id.) Detective Rapp asked Boyd about the marijuana found underneath the front passenger's seat and Boyd stated that he would take the blame for it. (Id.) Detective Rapp asked Boyd if he smoked marijuana and Boyd stated that he did. (Id.) When asked if he was addicted to weed, Boyd replied that he liked the feeling, but he would not say that he was addicted. (Id.) Detective Rapp spoke to Boyd for five to ten minutes before turning the questioning over to Special Agent Donaldson. (Id.) Special Agent Donaldson then talked to Boyd about the federal warrant. (Id.) Detective Rapp did not tell Boyd that he was facing a charge of being an unlawful drug user in possession of a firearm. (Id.) Detective Rapp admitted that he intentionally asked Boyd about the marijuana and the gun

---

[10]Rule 4(c)(3)(A) provides in part: "Upon arrest, an officer possessing the warrant must show it to the defendant. If the officer does not possess the warrant, the officer must inform the defendant of the warrant's existence and of the offense charged ...."

before telling him that he was already charged in federal court with being an unlawful drug user in possession of a firearm.  (Id.)

As set forth above, in United States v. Jones, 23 F.3d 1307 (8th Cir. 1994), the Eighth Circuit Court of Appeals set forth the following discussion about the validity of a Miranda rights waiver:

> "The inquiry [into the validity of a waiver] has two distinct dimensions. ... First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

Id. at 1313 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

The Court finds the facts of this case comparable to the facts in United States v. Rogers, 906 F.2d 189 (5th Cir. 1990).  In Rogers, the defendant, a felon, was summoned to the county sheriff's office to speak with someone about stolen guns that he had previously purchased from Philip Thrasher and which he had assisted the sheriff's department in recovering.  Id. at 192.  At the sheriff's office, the defendant was given his Miranda rights by two federal officers.  Id.  The court wrote:

> Though the *Miranda* warning was given, Rogers indeed "misunderstood the consequences of speaking freely to the law enforcement officials."  Colorado v. Spring, 479 U.S. 564, 575 (1987).  Because the interview was conducted under the auspices of the Lee County Sheriff's Department, whose representatives had assured Rogers that he would not be prosecuted for his purchase of the stolen guns, Rogers' statement was not "voluntary" for purposes of the Fifth Amendment.  Rogers did not know that he was a suspect, and the federal agents in no way revealed to him that he rather than Thrasher was the target of their investigation.  Under the totality of the circumstances, Rogers' waiver of his Fifth Amendment rights was not made with a full awareness of the consequences of the decision to abandon his rights or with the requisite level of comprehension.  See Moran v. Burbine, 475 U.S. at 421 ....

Rogers, 906 F.2d at 192.

In the case before this Court, defendant Boyd had been arrested under a warrant that stated he had been charged with being a felon in possession of a firearm.  Defendant Boyd knew that an error had been made because he did not have a felony conviction.  Detective Rapp and Special Agent Donaldson knew that Boyd was confused as to why he had been arrested, and unlike the

arresting officer, Detective Rapp and Special Agent Donaldson knew the actual charge contained in the Indictment. Yet, they did nothing to reveal to Boyd that there were charges pending against him for being an unlawful drug user in possession of a firearm until after they had obtained damaging admissions from him. The deliberate exploitation of defendant Boyd's lack of knowledge of the charges he was facing negates the voluntariness of defendant's relinquishment of his rights and the voluntariness of the statement given by defendant.[11] As in Rogers, defendant Boyd's waiver of his Fifth Amendment rights was not made with a full awareness of the consequences of the decision to abandon his rights or with the requisite level of comprehension. Thus, defendant's waiver of his Miranda rights was invalid and his statement must be suppressed.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting in part and denying in part Defendant's Motion to Suppress Evidence (doc #17). The motion should be granted to the extent that it seeks suppression of items discovered within the duffel bag, the portion of defendant's May 10, 2008 statement in which defendant discusses the scale discovered in the duffel bag and the entirety of defendant's February 24, 2010 statement. The remainder of the motion should be denied.

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.



/s/ Sarah W. Hays

---

[11]Pursuant to 18 U.S.C. § 3501(b)(2), the Court must take into consideration "whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession" when determining the issue of the voluntariness of a confession.

SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE